# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Shannon Evans (M-05017), | ) |
| Petitioner, | ) |
| | ) No. 17 C 8571 |
| v. | ) |
| | ) Hon. Jorge L. Alonso |
| Jacqueline Lashbrook Warden, | ) |
| Menard Correctional Center, | ) |
| Respondent. | ) |

## MEMORANDUM OPINION AND ORDER

Petitioner Shannon Evans, a prisoner at Menard Correctional Center proceeding *pro se*, filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. He challenges his 2004 Cook County conviction for murder. Respondent has answered the petition, arguing that Petitioner's claims are procedurally defaulted. As more fully explained below, Respondent is correct. The Court denies the § 2254 petition and declines to issue a certificate of appealability.

## BACKGROUND[1]

Petitioner was convicted of shooting and killing Robert Duffy on October 13, 2005. *People v. Evans*, 81 N.E.3d 534, 537 (Ill. App. Ct. 2017). At trial, Tina Mosley, Duffy's longtime girlfriend, testified that: Duffy and Petitioner were friends; they were members of the Gangster Disciples; and they sold drugs together at a house located at 2210 South Parnell Ave. in Chicago

---

[1] Under 28 U.S.C. § 2254(d)-(e)'s deferential standards of review, federal courts defer to the "the last reasoned opinion" by a state court addressing a claim asserted in a § 2254 petition. *Wilson v. Sellers*, 138 S. Ct. 1188, 1194 (2018); *Hartsfield v. Dorethy*, 949 F.3d 307, 309 n.1 (7th Cir. 2020) ("We take the facts from the Illinois Appellate Court's opinions because they are presumptively correct on habeas review.") (citing § 2254(e)(1)). In this case, the last reasoned opinion is the state appellate court decision addressing Petitioner's post-conviction appeal. *People v. Evans*, 81 N.E.3d 534 (Ill. App. Ct. 2017). The Court notes Petitioner's assertion with each of his § 2254 claims that he "objects to the state[] court's factual findings as being incorrect." (Dkt. 1, pg. 5-6.) But he neither explains nor provides anything further to support this statement. To the extent the state court's description of the background facts are findings of fact based on its review of the record, they are presumed correct, and Petitioner has not rebutted the presumption. *See* § 2254(e)(1); *Hartsfield*, 949 F.3d at 309 n.1.

(the "Parnell house"). *Id.* One of their regular customers was Rashad Bethany, and Mosely often saw Petitioner, Duffy, and Bethany together. *Id.*

On the day after Duffy was shot and killed, Mosley saw both Petitioner and Bethany. *Id.* Petitioner's eyes were bloodshot, he was shaking, and he appeared nervous. *Id.* He told Mosley that he and Duffy were conducting a drug deal at the Parnell house with members of another gang. *Id.* Petitioner told Mosley that one of the other gang members pulled out a gun, a fight ensued, and Duffy was shot. *Id.* Petitioner further stated that he shot one of the other gang members and fled to hide his gun. *Id.* When he returned, he saw two bodies being placed in an ambulance. *Id.*

Eischa Tooney testified that she lived about a block from the Parnell house. *Id.* She stated that, on October 13, 2005, Petitioner, Bethany, and two other men known as Little Ricky and Peanut were on her porch drinking, as they often did. *Id.* She saw all four men leave her porch and walk toward the Parnell house. *Id.* Five to ten minutes later, Tooney heard gunshots and then saw all four men running away from the Parnell house, along with other people on that block. *Id.*

The next time Tooney saw Petitioner was at Duffy's funeral. *Id.* He told her that he was worried he was being framed for the murder. *Id.* Tooney replied she had heard nothing about the shooting. *Id.* One or two months later, when Petitioner, Bethany, Little Ricky, and Peanut were again at Tooney's house, she heard Bethany brag about shooting Duffy and stealing his drugs. *Id.* Although Tooney testified at trial that she could not remember if Petitioner said anything about the shooting, she was reminded of her grand jury testimony where she stated that Petitioner admitted to being a "part of it" and helped steal Duffy's money and drugs. *Id.* at 537-38. When asked about her grand jury testimony, Tooney responded: "I was asked those questions, and you say I answered that. Evidently, I answered that." *Id.* at 538. After her grand jury testimony, the State helped Tooney relocate for her safety and paid her travel expenses. *Id.*

Patrick Fallie testified that he had known Petitioner since childhood. *Id.* Although Fallie stated at trial that he did not know his whereabouts on October 13, 2005, he was impeached with his grand jury testimony, wherein he stated that he witnessed the shooting. *Id.* According to his grand jury testimony, on the night of the shooting, Fallie was in his car across the street from the Parnell house waiting for two friends to purchase cigarettes from the house next to it (the "cigarette house"). *Id.* Fallie stated he saw Duffy limp out of the Parnell house, followed by Petitioner and another man, both holding guns. *Id.* Duffy was facing Petitioner, had his hands in front of his face as if to block bullets, and said: "Don't shoot, don't shoot, it aint worth it, don't kill me." *Id.* at 538. Fallie stated that Petitioner shot Duffy four or five times, then picked up a bag Duffy was carrying, and ran. *Id.* Fallie further told the grand jury that he did not tell the police this information sooner because he feared for his life. *Id.*

Chicago police officer Roberta Honeycutt testified that she was the first officer at the scene after the shooting. *See People v. Evans*, No. 1-09-1389, 2011 WL 9692669, at *4 (Ill. App. Ct. July 15, 2011). Duffy was still alive when she arrived. *Id.* An ambulance came shortly thereafter, and Duffy was transported to a hospital. *Id.* Honeycutt stated there was no one other than Duffy injured at the scene. *Id.*

Petitioner called one witness, Markina Polk, to testify. *Id.* Polk stated that, on the night of the shooting, she and a friend (referred to as "Mike Mike") went to the cigarette house to buy cigarettes. *Evans*, 81 N.E.3d at 538. Polk saw Fallie, who she knew, sitting in a car across the street. *Id.* As Polk approached the cigarette house, she saw Duffy on the lawn of the Parnell house arguing with two men she did not know. *Id.* One of the men was armed. *Id.* One of the men pushed Duffy, and the man with a gun then began shooting him. *Id.* According to Polk, neither of the two men was Petitioner. *Id.* Once the shooting began, Polk ran into the cigarette house. *Id.* She stated

3

she heard around five shots. *Id.* Polk testified that she attempted to contact police officers after she heard that Petitioner had been arrested for the shooting. *Id.* She did not pursue the matter, however, because she was afraid of the actual shooters. *Id.*

A jury found Petitioner guilty of murdering Duffy. *Id.* Petitioner was sentenced to 45 years' imprisonment, and received an additional 20-year consecutive sentence for personally discharging a firearm. *Id.*

On direct appeal, Petitioner argued: his Illinois right to a speedy trial was violated; the trial court improperly admitted hearsay evidence; and the trial evidence was insufficient to support his conviction. *Evans*, 2011 WL 9692669, at *6-9. The state appellate court denied all three claims. *Id.* Petitioner filed a petition for leave to appeal (PLA) in the Illinois Supreme Court, asserting only his speedy-trial claim. (Dkt. 7-1.) The state supreme court denied the PLA. *People v. Evans*, 962 N.E.2d 484 (Ill. 2011).

Petitioner filed a state post-conviction petition and then, after counsel was appointed, an amended petition. *Evans*, 81 N.E.3d at 538. His amended post-conviction petition argued: (1) new evidence—affidavits from Mike Miles and Tiara Murph and DNA evidence found in the Parnell house—demonstrated Petitioner's actual innocence; and (2) ineffective assistance of counsel for failing to adequately investigate and present evidence of Petitioner's innocence. *Id.* at 538-39. Miles's affidavit, similar to Polk's testimony, stated: he drove Polk to the cigarette house; he was in his car when he saw two men chase Duffy out of the Parnell house; one of the men, who Miles recognized as "Gotta," shot Duffy; neither of the two men was Petitioner; Miles did not contact the police because he feared for his safety; and Miles would have testified for Petitioner at his trial if he was asked to do so. *Id.* at 539.

Murph stated in her affidavit that, as she was walking home, she saw two men chase Duffy out of the Parnell house. *Evans*, 81 N.E.3d at 539. Upon hearing gunshots, she ran home. *Id.* Murph's grandmother moved Murph to Indiana for her safety. *Id.* She returned to Chicago sometime later to learn that Petitioner had been convicted for Duffy's murder. *Id.* Murph knew Petitioner from the neighborhood and knew he was not one of the men who chased Duffy out of the Parnell house. *Id.*

The DNA evidence consisted of swabs taken from two juice bottles found in the Parnell house which did not match Petitioner's DNA. (Dkt. 7-5, pg. 54-55.) The state trial court denied Petitioner's post-conviction claims on the merits. *Id.* at 539-40.[2]

In his post-conviction appeal, Petitioner argued: (1) he presented new, noncumulative evidence (Miles's and Murph's affidavits) establishing his actual innocence and (2) his trial attorney was ineffective for failing to reasonably investigate and call Miles as a witness. (Dkt. 7-5.) The state appellate court rejected both claims. *Evans*, 81 N.E.3d at 541-45. In his PLA to the Illinois Supreme Court, Petitioner argued only his state-law actual innocence claim. (Dkt. 7-2.)

## DISCUSSION

Petitioner's § 2254 petition asserts four claims: (1) his constitutional speedy-trial right was violated; (2) the evidence was insufficient to support his conviction; (3) new evidence—Murph's and Miles's affidavits and DNA evidence—"made a substantial showing that Petitioner was actually innocent," and (4) ineffective assistance by both trial and appellate counsel—(a) trial counsel allegedly "failed to investigate/present evidence discrediting the state's theory of the case," "failed to explain sentencing consequences" with respect to a plea offer, and "failed to object

---

[2] Petitioner's post-conviction petition was filed two days late. Though time-bar was one of the reasons the trial court initially denied the petition, on reconsideration, the trial court determined that Petitioner was not culpably negligent and vacated the part of its order dismissing the petition as untimely. *Evans*, 81 N.E.3d at 540. The State repeated its time-bar argument in the appellate court, which rejected the argument. *Id.* at 540-41.

5

to inadmissible evidence/improper argument," and (b) appellate counsel failed to argue trial counsel's ineffective assistance and failed to challenge the "trial court ruling on Eischa Tooney" (presumably with admission of her grand jury testimony into evidence). (Dkt. 1, pg. 5-6.)

Respondent argues that Petitioner's claims are procedurally defaulted because he did not exhaust state court remedies. Respondent, for the most part, is correct.

**The Exhaustion Requirement and Procedural Default:**

State prisoners seeking habeas corpus relief in federal court must "exhaust[ ] the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). They must "give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts," which is accomplished "by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). As the Supreme Court explains, "[s]tate courts, like federal courts, are obliged to enforce federal law. Comity thus dictates that when a prisoner alleges that his continued confinement for a state court conviction violates federal law, the state courts should have the first opportunity to review this claim and provide any necessary relief." *Id.*

"To preserve a claim for federal collateral review, the petitioner must 'fairly present' it to all levels of the state judiciary." *Lockheart v. Hulick*, 443 F.3d 927, 929 (7th Cir. 2006). This means that Illinois prisoners must give both the state appellate court and "the Illinois Supreme Court the opportunity to resolve constitutional errors in the first instance." *Boerckel*, 526 U.S. at 846; *Lewis v. Sternes*, 390 F.3d 1019, 1025-26 (7th Cir. 2004) (a prisoner must raise his constitutional claim "at each and every level in the state court system, including levels at which review is discretionary").

In this case, Petitioner asserted several claims in his direct appeal and post-conviction pleadings. But the only claims he raised in his PLAs to the state supreme court were: (1) violation of his Illinois right to a speedy trial; and (2) an Illinois claim of actual innocence based on new evidence. (Dkts. 7-1, 7-2.) His § 2254 claims that the trial evidence was insufficient to support his conviction and that his trial and appellate attorneys' representation was constitutionally deficient (Claims Two and Four) were not presented to the Illinois Supreme Court and thus are unexhausted. *See Boerckel*, 526 U.S. at 846; *Lewis*, 390 F.3d at 1025-26; § 2254(b).

Petitioner's Claim One (violation of his speedy trial right) is also unexhausted. As noted above, Petitioner presented a state-law claim of a speedy-trial violation to the Illinois Supreme Court. (Dkts. 7-1.) His PLA, however, did not present the federal nature of this claim to the state supreme court. *Id.* A petitioner must "properly alert the [state courts] to the federal nature of [the] claim." *Baldwin v. Reese*, 541 U.S. 27, 30 (2004). Petitioner's PLA on direct appeal stated that he was "not argu[ing] that his constitutional right to a speedy trial was violated. . . . [T]he specific issue on appeal is only whether [his Illinois] statutory right to a speedy trial was violated . . . [under 725 ILCS 5/]103-5(a)." (Dkt. 7-1, pg. 12.) While this Court can consider various factors when addressing whether a federal claim was fairly presented to a state court, ultimately the Court's "'task is to determine in practical terms whether the state courts were sufficiently alerted to the nature of [the petitioner's] federal constitutional claim'" *Hicks v. Hepp*, 871 F.3d 513, 531 (7th Cir. 2017) (quoting *White v. Gaetz*, 588 F.3d 1135, 1139 (7th Cir. 2009). Where Petitioner expressly explained to the Illinois Supreme Court that he was presenting only a state speedy-trial claim, this Court concludes that a federal speedy-trial claim was not fairly presented.

As to Claim Three of Petitioner's § 2254 petition (actual innocence), the claim exists only under state law. Illinois' Constitution allows a free-standing claim of actual innocence. *People v.*

7

*Washington*, 665 N.E.2d 1330, 1337 (Ill. 1996) ("as a matter of Illinois constitutional jurisprudence that a claim of newly discovered evidence showing a defendant to be actually innocent of the crime for which he was convicted is cognizable"). Under the federal Constitution, however, "'actual innocence' is not itself a . . . claim." *Herrera v. Collins*, 506 U.S. 390, 404 (1993). "To date, an assertion of actual innocence based on evidence post-dating a conviction has not been held to present a viable claim of constitutional error." *Arnold v. Dittmann*, 901 F.3d 830, 837 (7th Cir. 2018); *see also McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013). Petitioner may have asserted his actual innocence claim at each level of state court review, but the claim is not cognizable in a federal habeas case. If this Court addressed this claim on the merits, it would be reviewing a state law claim. "'[F]ederal habeas corpus relief does not lie for errors of state law.'" *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (quoted case omitted); *see also* § 2254(a) (federal habeas relief is for "violation[s] of the Constitution or laws . . . of the United States"); *Stanley v. McCulloch*, No. 15-CV-20-WMC, 2015 WL 412836, at *2 (W.D. Wis. Jan. 30, 2015) (federal habeas courts do not serve as a "super state supreme court" to correct a state court's erroneous application of state law).

For the above, stated reasons, Petitioner's § 2254 Claims One, Two, and Four are unexhausted and procedurally defaulted. Claim Three does not present a valid ground for federal habeas relief.

**Petitioner Satisfies Neither Exception to Procedural Default:**

A procedural default "may be excused when the petitioner shows both cause for the default and actual prejudice, or shows that federal review is needed to prevent a fundamental miscarriage of justice." *Tabb v. Christianson*, 855 F.3d 757, 765 (7th Cir. 2017). To demonstrate cause, the prisoner must "show that some objective factor external to the defense impeded [hi]s efforts to

8

comply with the State's procedural rule." *Davila v. Davis*, 137 S. Ct. 2058, 2065 (2017). Petitioner provides no reason, and the Court sees none, why he could not have raised his federal claims at each level of state court review. He has not demonstrated cause for his default.

Nor has Petitioner demonstrated that a fundamental miscarriage of justice would result if the Court does not review the merits of his claims. Although actual innocence is not a freestanding § 2254 claim, it can excuse a procedural bar to allow a federal court to review the merits of a defaulted claim. Petitioner's § 2254 pleadings do not assert actual innocence as a ground to excuse procedural default. He never responded, nor was he directed to respond, to Respondent's procedural bar argument. The Court nonetheless notes that Murph's and Miles's affidavits and the DNA evidence—the basis of his state actual innocence claim—do not satisfy the standard for the fundamental miscarriage of justice exception even if Petitioner would have made the argument.

"The fundamental miscarriage of justice standard erects an extremely high bar for the habeas petitioner to clear. It applies only in the rare case where the petitioner can prove that he is actually innocent of the crime of which he has been convicted." *McDowell v. Lemke*, 737 F.3d 476, 483 (7th Cir. 2013) (citing *Schlup v. Delo*, 513 U.S. 298, 324 (1995)). It is reserved for the "exceptional case" where "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup*, 513 U.S. at 327. "To pass through the actual-innocence gateway to a merits review . . ., [a] petitioner must have 'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence— that was not presented at trial. . . and must persuade the district court that it is 'more likely than not that no reasonable juror would have convicted him in light of the new evidence.'" *Jones v. Calloway*, 842 F.3d 454, 461 (7th Cir. 2016) (quoting *Schlup*, 513 U.S. at 324, 327). "'New evidence' in this

context does not mean 'newly discovered evidence'; it just means evidence that was not presented at trial." *Jones*, 842 F.3d at 461 (citation omitted).

If a petitioner presents new, reliable evidence, the habeas court must then consider "'all the evidence,' old and new, incriminating and exculpatory," and make "a probabilistic determination about what reasonable, properly instructed jurors would do." *House*, 547 U.S. at 538. The petitioner must establish that, more likely than not, no reasonable juror considering the newly supplemented record would have found him guilty beyond a reasonable doubt. *Id.*

The Court notes that neither Petitioner nor Respondent submitted trial transcripts or Murph's and Miles's affidavits with their § 2254 pleadings. Under Rule 5(c) of the Rules Governing § 2254 Cases, Respondent is tasked with supplying the relevant parts of the transcripts with its answer. As to the affidavits and new DNA evidence, that task appears to be Petitioner's. "A defendant who asserts actual innocence as a reason to excuse a procedural default must *demonstrate* innocence; the burden is his, not the state's, for the state has the benefit of the jury's verdict." *Buie v. McAdory*, 341 F.3d 623, 626-27 (7th Cir. 2003) (emphasis in original). Nevertheless, the parties and the state court decisions sufficiently describe the trial evidence and Petitioner's new evidence such that this Court can determine that the new evidence does not establish actual innocence to excuse his procedural default. *See Thompson v. Battaglia*, 458 F.3d 614, 617 (7th Cir. 2006) (although a § 2254 record with transcripts may be preferred, often claims can be resolved without portions of the transcript); *see also Hitchcock v. Jackson*, No. 4:06-CV-13551, 2008 WL 2544793, at \*\*3, 8 (E.D. Mich. June 20, 2008) (district court was able to address whether the fundamental miscarriage of justice exception applied without transcripts).

Miles's affidavit states he drove Polk to the cigarette house next to the Parnell house and was in his car at the time of the shooting. *Evans*, 81 N.E.3d at 539. Like Polk's testimony, Miles

states he saw Duffy limp from the Parnell house, followed by two men. *Id.* Miles recognized one of the men as "Gutta." He did not recognize the other man, who appeared to be six feet tall (Petitioner is only five feet, five inches according to the Illinois Department of Corrections website). *Id.*; *see also* (Dkt. 7-5, pg. 53-54.)

Murph stated in her affidavit that she was walking home when she saw two men chasing after Duffy, who had limped out of the Parnell house. *Id.* The two men began shooting Duffy, at which time Murph ran. *Id.* Murph's grandmother moved her to Indiana for her safety. *Id.* She stayed away for several years. When she returned, she learned that Petitioner, who she knew from the neighborhood, had been convicted for Duffy's murder. *Id.* She knew that she had not seen him the night of the shooting, and decided to come forward at that time. *Id.*

The DNA evidence—test results from swabs taken from two juice containers in the Parnell house—did not exclude Petitioner from the house, but rather, simply showed that others had been there. (Dkt. 7-5, pg. 54-55.)

Had the evidence against Petitioner consisted only of eyewitness testimony from Patrick Fallie, whether new evidence from two additional eyewitnesses satisfies the fundamental miscarriage of justice exception may be a closer issue. But testimony from Eischa Tooney and Tina Mosley indicated not only that Petitioner was at the Parnell house at the time of the shooting but also that he admitted to being a part of the shooting. Tooney testified that she saw Petitioner, along with three others, walk toward the Parnell house and, just after hearing gunshots soon after, saw Petitioner and the three men running from the direction of the Parnell house. *Evans*, 81 N.E.3d at 537. Tooney's grand jury testimony, which was read into evidence, further stated that, about a month after the shooting, she heard Petitioner admit to being "part of it." *Id.*

Tina Mosley, Duffy's girlfriend, testified that Petitioner told her the day after the shooting that he and Duffy were selling drugs to members of another gang when one of them pulled out a gun, a fight ensured, and Duffy was shot. *Evans*, 81 N.E.3d at 537. According to Mosley's testimony, Petitioner told her that he shot one of the other gang members after Duffy was shot, that he then ran from the scene, and that he later saw two men being placed in an ambulance.[3] *Id.*

Petitioner's jury thus heard testimony that Petitioner admitted to two different people that he was present when Duffy was shot. In addition to this evidence, Fallie testified that he saw Petitioner shoot Duffy. Adding testimony from two eyewitnesses who would have stated, similar to Markina Polk's testimony, that they witnessed two men shoot Duffy and that neither man was Petitioner is not evidence so compelling to demonstrate that no reasonable juror would have convicted. *See Coleman v. Lemke*, 739 F.3d 342, 352-54 (7th Cir. 2014) (simply adding testimony from two eyewitnesses that the petitioner was not at the scene of the shooting did not demonstrate actual innocence when other evidence connected the petitioner to the crime).

As explained in *Coleman*, a court addressing a claim of actual innocence as an exception to procedural default cannot assess new witness "statements in a vacuum. Rather, to evaluate their impact on a hypothetical jury, we must consider them in tandem with the testimony of other witnesses to [the] murder and any other evidence linking [the petitioner] to the crime." *Id.* at 352-53; *see also Smith v. McKee*, 598 F.3d 374, 388 (7th Cir. 2010) ("statements from two witnesses not called at trial [an alibi witness and an eyewitness who stated the petitioner was not at the scene of the shooting] . . . [did] not sufficiently counter the state's two eye witness identifications and the evidence of [the petitioner's] self-inculpating statement" to officers). "To demonstrate

---

[3] Mosley's testimony about Petitioner's version of the shooting described above does not comport with testimony from Officer Honeycutt, who stated that she was the first officer to arrive at the scene, where there was only one body. *Compare Evans*, 2011 WL 9692669, at *4, with *Evans*, 81 N.E.3d at 537.

12

innocence so convincingly that no reasonable jury could convict, a prisoner must have documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who placed him out of the city, with credit card slips, photographs, and phone logs to back up the claim." *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) (citing *Schlup*, 513 U.S. at 324). Murph's and Miles's purported testimony, when considered with other witnesses' testimony about Petitioner not only being at the scene of the shooting but also being a part of it, does not establish actual innocence.[4]

Petitioner's new evidence does not "make a convincing showing of actual innocence." *Jones v. Calloway*, 842 F.3d 454, 460-61 (7th Cir. 2016) (new evidence in the form of an affidavit from the gunman stating the "he—and he alone—shot" the victim sufficed to establish the petitioner's actual innocence to excuse procedural default). Only where a petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error," should the petitioner "be allowed to pass through the gateway and argue the merits of his underlying claims." *Schlup*, 513 U.S. at 316. Petitioner's new evidence is not so strong that it "persuades th[is] court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id.* at 329; *Coleman*, 739 F.3d at 354.

The Court thus concludes that Petitioner's § 2254 claims are either procedurally defaulted or non-cognizable for federal habeas review, and that Petitioner does not demonstrate, nor can he, that an exception to procedural default applies to warrant review of his claims on the merits. Accordingly, the Court dismisses Petitioner's § 2254 petition.

---

[4] As to the DNA evidence, it demonstrated only that two other people had been in the Parnell house. This Court agrees with the stat trial court, which found that "[s]uch evidence hardly supports Petitioner's claim that he is actually innocent." (Dkt. 7-5, pg. 55.)

13

*Certificate of Appealability and Notice of Appeal Rights*

Petitioner is advised that this is a final decision ending his case in this Court. If he wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). Petitioner need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. However, if he wants the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). A Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). A Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

The Court declines to issue a certificate of appealability. Petitioner cannot make a substantial showing of the denial of a constitutional right, or that reasonable jurists would debate, much less disagree, with this Court's resolution of Petitioner's claims. *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (citing 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

## CONCLUSION

Petitioner's habeas corpus petition (Dkt. 1) is denied. Any pending motion is also denied as moot. The Court declines to issue a certificate of appealability. The Clerk is instructed to change

14

the name of Respondent to Alex Jones, Acting Warden of Menard Correctional Center and enter judgment in favor of Respondent and against Petitioner. Civil Case Terminated.

**SO ORDERED.**                                    **ENTERED: March 26, 2020**

                                                          **HON. JORGE ALONSO**
                                                          **United States District Judge**

.